**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 25-50430-LRC |
| NUTRACAP HOLDINGS, LLC, | CHAPTER 11 |
| Debtor. | |
| NUTRACAP LABS, LLC, JOHN WESLEY HOUSER, DAVID BROMWICH, and THOMAS P. LENNON, | |
| Movants, | CONTESTED MATTER |
| v. | |
| NUTRACAP HOLDINGS, LLC, | |
| Respondent. | |

**EXPEDITED MOTION FOR APPOINTMENT OF**
**CHAPTER 11 TRUSTEE UNDER 11 U.S.C. § 1104(a)**

Nutracap Labs, LLC, John Wesley Houser, David Bromwich, and Thomas P. Lennon (the "**Movants**"), parties in interest in the above-captioned chapter 11 case of Nutracap Holdings, LLC ("**Debtor,**" the "**Company**" or "**Nutracap**"), respectfully submit this motion ("**Motion**") for entry of an order, substantially in the form attached as **Exhibit A**, providing for the expeditious appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a) and the replacement of Debtor's current CEO. In support, Movants submit the following memorandum of law and the Declaration of Thomas P. Lennon ("**Lennon Declaration**") attached as **Exhibit B**, and show the Court as follows:

## INTRODUCTION

Movants aver that Debtor's current management has exhibited all four statutory factors requiring the appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a). In the last two years since the current CEO bought Nutracap from the Movants, the CEO has exhibited fraud, dishonesty, gross mismanagement, material breaches of fiduciary duty, and serious operational incompetence causing the rapid decline of the Company. In this case at least, W. Edwards Deming's maxim was correct: "Management is always the problem."

The Movants are the founder and former owners, board members, and executives of the Debtor. It took them 11 years to build Nutracap from $4 million in first year sales to $74 million in 2022. In contrast, it only took the new CEO two years to cause a complete reversal. After the Movants left, under the new CEO with essentially the same employees and the same products, Nutracap's business collapsed from $74 million in annual sales in 2022 to $48 million in 2023 and $26 million in 2024, and from a net profit of $6.9 million to operating losses of $4 million and $2.5 million, respectively.

While many chapter 11 debtors in possession have declining sales, section 1104 of the Bankruptcy Code mandates the appointment of a chapter 11 trustee in those cases where the current CEO has demonstrated "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." Movants respectfully submit that this is such a case.

Equally important, the window of opportunity for anyone else to execute a successful turnaround is closing rapidly. While the chances that current management can turn things around are nil, accomplishing a significant turnaround will require both new management and new money. Right now, the Movants stand ready to provide both. Based on the same Letter of Intent negotiated and signed by the Debtor's CEO on December 16, 2024, and an agreement on purchasing the debt

from First Horizon Bank based on the December 17, 2024, LOI, the Movants are ready to bring in $7 million in new capital, including an immediate priming loan of $1.5 million, and they have already proven that they can successfully run and grow the company. Moreover, they have long-term relationships with key suppliers, key employees who have quit but would return, and major national customers who left over the last two years. But the dishonesty, incompetence, and gross mismanagement occurring under the current CEO must cease immediately.

**RELIEF REQUESTED**

The Movants are the former owners, board members, and key executives of the Company. They seek an expedited evidentiary hearing to demonstrate grounds requiring the immediate appointment of a chapter 11 trustee. In addition to being required under 11 U.S.C. § 1104, the replacement of the current CEO is essential to save the Company from having to cease operations and avert a wholesale liquidation. In that event, unsecured creditors would get nothing for millions of dollars in claims and more than 100 employees will lose their livelihood.

By this Motion, Movants seek entry of an order, substantially in the form attached as **Exhibit A**, (a) appointing a Chapter 11 trustee for cause under 11 U.S.C. § 1104(a)(1), or alternatively, (b) determining that appointment of a trustee is in the best interests of creditors under § 1104(a)(2). In the event the Court declines to appoint a trustee, the appointment of an examiner is mandated under § 1104(c) because liquidated unsecured debts exceed $5 million. However, while additional oversight and an examiner may help explain where some of the money went, for any chance of an effective turnaround, new money and new management are needed in weeks not months.

**FACTS**

**Current Management's Two-Year Steep and Rapid Decline**

1.      Prior to executing an LOI in June of 2020 with Virtu Equity, Marcos Fabio Lopes e Lima (the new CEO of Nutracap, the "CEO" or "Mr. Lima"), and a group of investors, the Company was growing over 40% year over year. (Declaration of Thomas P. Lennon ("Dec."), Exhibit B, at ¶ 6.)

2.      In November 2020, DBD DTA Corporation and Virtu Equity (collectively "Virtu") purchased a minority interest in Nutracap. (Dec. at ¶ 7.)

3.      One year later, around November 2021, Virtu exercised an option to purchase the remaining shares of Nutracap from the Movants. As part of the purchase price and earnout, the Movants took back unsecured promissory notes for more than $23 million with the Debtor's parent company, DBD DTA Corporation. There is a remaining balance on these loans of over $12 million today. (Dec. at ¶ 8.)

4.      The Movants remained with the Company under an earnout agreement until the end of 2022. For perspective, in 2022, Mr. Lima turned down a tender offer to acquire the Company for approximately $100 million in cash. (Dec. at ¶ 4.)

5.      In May of 2023, First Horizon Bank (the "Bank" or "First Horizon") provided credit facilities of up to $17 million in the form of a term loan and operating line of credit. At the time, Nutracap's annual sales were reasonably expected to exceed $100 million by the end of 2025. (Dec. at ¶ 5.)

6.      Shortly after the departure of the Movants, however, Mr. Lima began managing the Company on his own and quickly began to show signs of incompetence and gross mismanagement,

fostering a toxic corporate culture and environment that compounded the effects of objectively poor decisions. (Dec. at ¶ 11.)

7.    Objectively, under CEO Lima's management, the Company's revenue reversed sharply and began a steep decline. In 2021 and 2022, when the Movants were still running the Company, annual sales were $63 million and $74 million with net income of $7.0 million and $6.9 million, respectively. In 2023 and 2024, after the Movants left and Mr. Lima was running the Company as CEO, total sales plummeted to $48 million in 2023 and $26 million in 2024, with net losses of $4 million and $2.5 million, respectively. (Dec. at ¶ 9.)

8.    The current CEO's mismanagement caused the reversal and decline. For example, while annual revenues were falling from $74 million to $46 million in his first year, he hired an additional 250+ employees, alienated critical customers, restructured sales commissions downward causing the best sales and marketing people to leave, and leased a new 200,000 sq ft building that was never actually utilized. (Dec. at ¶ 11.) Movants assert that it may well constitute "gross mismanagement" as a matter of law when Mr. Lima's management resulted in the unnecessary decline in annual sales from $74 million to $26 million in his first two years.

9.    Due to the rapid and consistent decline in sales, combined with millions of dollars wasted on the additional personnel, facilities, and other unnecessary expenses, the Company defaulted on the May 2023 loan of $17 million from First Horizon shortly thereafter, and the relationship was sent to special assets at the Bank by the end of 2023. (Apparently, this set a record within the Bank for a loan closing and then being sent to special assets within six months.) (Dec. at 12.)

10.    Now, several key suppliers have cut off the company completely and customers have left and continue to leave. (Dec. at ¶ 13.)

11.    After two years under Mr. Lima, the Company cannot fulfill prepaid orders because it spent the money and cannot buy the supplies. Now, the Company depends upon false promises made to virtually every new customer, in what is essentially a Ponzi scheme, hoping they will get enough new deposits to manufacture some of the old orders—while it only makes the situation worse. This is a classic death spiral that likely only ends one way unless something changes quickly. (Dec. at ¶¶ 14–15.)

12.    Customers have paid hundreds of thousands of dollars in deposits, only to find that Mr. Lima spent the money on other things and is now unable to buy the inventory needed to produce the products that were paid for in advance (Dec. at ¶ 15).

13.    In fact, the Company recently sent a letter to suppliers *admitting* that it had diverted customer deposits and would need more than a million dollars it does not have to buy inventory and supplies to produce the orders for which it already spent the deposits. (*Id.*)

14.    The only secured creditor, First Horizon Bank, is owed approximately $14 million but would probably only receive about $3 million in a liquidation at this point, and unsecured creditors would receive nothing. (Dec. at ¶ 19.)

15.    Trust and morale are just as bad internally. Many of the employees who are still there are demoralized and appalled at what has taken place over the last year. CEO Lima ran off a majority of the Company's best sales and marketing personnel over the past 18 months, and recently, the Company's remaining key marketing people quit. (Dec. at ¶¶ 11, 13.)

16.    In the last payroll, the Company failed to pay salespeople commissions that were earned and due. Additionally, the Company failed to pay the overtime portions of employees' paychecks, blaming it on needing authorization from the bankruptcy court—even though the non-overtime amounts were paid. (Dec. at ¶ 16.)

17.    Meanwhile, the Company stated at the initial hearing on first day motions that the CEO Mr. Lima is maintaining his $340,000 annual salary and his wife's $60,000 annual salary.

18.    The amount of the Debtor's available cash, which was stated at the initial hearing as approximately $400,000, is only enough to cover three weeks of operations.

## Expedited Relief Sought

19.    Concurrently with this Motion, Movants have filed a Motion for Emergency Hearing, seeking an **expedited in-person evidentiary hearing** within the next two weeks or as soon as the matter may be heard. Time is of the essence, and an independent trustee and new management are essential. The actions of current CEO Lima continue to jeopardize any reasonable chance of a viable reorganization and are now an imminent threat to the Company's ability to continue. (Dec. at ¶¶ 17–19.)

## Parties in Interest

20.    The Movants collectively hold more than $12 million in unsecured notes arising from their sale of the Company to the current CEO. In addition, the Movants have deep experience and substantial expertise in the industry. Wes Houser, for example, founded the Company in 2011, building it from $4 million in first year sales to $74 million in 2022. Even more important right now, he has long-term relationships—and trust earned over years—with key suppliers and customers. David Bromwich was the president and COO during the Company's last several years of continuous growth, and Tom Lennon was the Company's corporate finance consultant and advisor as well as an active board member who facilitated corporate development. (Dec. at ¶¶ 3, 8.)

21.    The contrast in financial results between the Movants and the current CEO is stark: In 2021 and 2022, when the Movants were running the Company, annual sales were $63 million and $74 million, and net income was $7 million and $6.9 million. In 2023 and 2024, when Mr.

Lima was running the Company as CEO, total sales were $48 million and $26 million, with net losses of $4 million and $2.5 million. (Dec. at ¶ 9.)

22.     Now, Movants stand ready to provide up to $7 million in new capital preceded by an immediate priming loan of $1.5 million if a neutral chapter 11 trustee is appointed and the current CEO is replaced by Movant Thomas Lennon. (Dec. at ¶ 17.)

### The December 16, 2024, Buyout Agreement

23.     After watching their former business being driven into the ground, Movants realized that their notes were going to be worthless if they didn't act (Dec. at ¶ 17). For most of the past year, Movants have been formulating a plan to repurchase the Company and engineer a turnaround. While the current CEO's gross mismanagement is practically undeniable, there is every reason to believe that the former owners can succeed despite the failures of the current CEO, Mr. Lima. (Dec. at ¶¶ 17–18.)

24.     On December 16, 2024 Watermark Capital Partners ("Watermark") on behalf of the Movants negotiated and executed an LOI that *the Debtor's CEO Lima* negotiated, approved, and signed (Dec. at ¶ 20). Subsequently on December 17, 2024, Watermark made an offer to purchase the First Horizon debt (Dec. at ¶ 21). In early January, the Bank agreed in principle to the offer from Watermark, returning a redlined version of the proposed debt purchase LOI (*Id.*).

25.     After Movants secured the agreements with the Company and CEO Lima as well as an agreement in principle with First Horizon, additional time was needed to finalize terms and conditions with the Bank and complete the documents for the overall repurchase. Movants proposed an adjusted closing date of January 31, 2025. (Dec. at ¶ 22.)

26.     However, Mr. Lima filed this bankruptcy instead on January 14, 2025. (Dec. at ¶ 23.)

**Movants Can Provide the Necessary New Capital and Management**

27.    Despite the bankruptcy filing, Movants represent that they are ready, willing, and able to close a transaction in line with the December 16, 2024, LOI previously agreed to by CEO Lima and the Bank. Movants stand ready to provide up to $1.5 million in DIP Financing via a short-term priming loan and up to an additional $5.5 million in new capital, which Movants allege is required to stabilize the business and its supplier and customer relationships. Dec. at ¶ 24.)

28.    Movants aver that a change in management back to the previous owners and executives—with whom the employees, suppliers, and customers have long-term experience and trust—combined with an influx of capital, would be enough to support a successful turnaround, fund a buyout of First Horizon Bank's claims in line with the LOI signed on December 16, 2024, ensure that all other vendors and creditors of the Company are satisfied, and enable more than 100 employees to keep their jobs. (Dec. at ¶ 25.)

## JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for relief are 11 U.S.C. §§ 1104 and 1112, along with Rules 2007.1 and 9014 of the Federal Rules of Bankruptcy Procedure.

## SUMMARY OF THE ARGUMENT

Section 1104(a)(1) requires the appointment of a trustee upon a showing of cause, including fraud, dishonesty, incompetence, or gross mismanagement. Courts have recognized that gross mismanagement exists when a debtor's management fails to preserve value or causes operational chaos, as alleged here. Movants point to the Debtor's inability to meet payroll consistently, misuse of customer deposits, false and fraudulent statements to suppliers and

customers, and the loss of key trade support, not to mention the two-year decline in annual sales from $74 million to $26 million under the current CEO, Mr. Lima.

Even if there were not sufficient cause under § 1104(a)(1), the appointment of a trustee is required under § 1104(a)(2) if doing so is in the best interests of creditors and the estate. First Horizon Bank is significantly undersecured. Like the Movants' $12 million in unsecured notes, unsecured creditors will likely receive nothing unless the Debtor's current management is replaced in short order. In contrast, based on the Movants' experience and long-term relationships, many of the suppliers would begin doing business with the Movants immediately, key employees would return, and significant customers would likely return before long.

Alternatively, if the Court denies appointment of a trustee, Movants seek appointment of an examiner as required under 11 U.S.C. § 1104(c), given that the Debtor's liquidated, unsecured debts exceed five million dollars. Movants submit, however, that only a trustee vested with full authority *and new management with an immediate influx of new capital* is capable of reversing the Debtor's downward spiral in time to prevent a total loss of all but a small percentage of the Bank's overall claim.

## ARGUMENT

The willingness of Congress "to leave a debtor in possession" is founded on the assumption that "the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *CFTC v. Weintraub,* 471 U.S. 343, 355 (1985); *see also* 11 U.S.C. § 1107(a). Debtor-in-possession status requires fiduciary behavior, ensuring the debtor maximizes the estate's value for creditors and, only if any value remains, for equity. If a debtor's management fails to fulfill these fiduciary obligations, the Bankruptcy Code not only allows, but mandates that "the stewardship of the reorganization effort must be turned over to an independent

trustee." *Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC),* No. 03-93397, 2004 Bankr. LEXIS 1113, at *5-6 (Bankr. N.D. Ga. Apr. 28, 2004) ("[O]nce a court, in its discretion, determines that the movant has met its burden of proving that cause exists under § 1104(a)(1), the court must order that a trustee be appointed.") (citing *In re Sharon Steel Corp.* 871 F.2d 1217, 1226 (3d Cir. 1989); *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),* 295 B.R. 502, 507 (D.N.J. 2003)).

I.    **A Chapter 11 Trustee Must Be Appointed Because Cause Exists Under 11 U.S.C § 1104(a)(1).**

A.    **The Legal Standard for Appointing a Chapter 11 Trustee Is Broad and Flexible.**

Section 1104(a) governs the appointment of a Chapter 11 trustee. It sets forth two independent bases upon which the Court "shall order the appointment of a trustee" if proven:

(1)    For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of the assets or liabilities of the debtor; or

(2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §§ 1104(a)(1) and (2).

The moving party must establish that the appointment of a trustee is warranted. *See Crescive Landscape Mgmt.,* No. 03-93397, 2004 Bankr. LEXIS 1113, at *6 (Bankr. N.D. Ga. Apr. 28, 2004). An earlier Third Circuit case held that the burden of proof is clear and convincing

evidence, but later authorities, in light of the Supreme Court's decision in *Grogan v. Garner,* 498 U.S. 279, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991), hold that the applicable burden of proof under § 1104(a) is the preponderance of the evidence. *Id.* (citing *In re Altman,* 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), vacated in part on other grounds by 254 B.R. 509 (D. Conn. 2000); *see also* 4 NORTON BANKRUPTCY LAW AND PRACTICE 2D § 79:4 n.37 (1995)).

Whether to appoint a trustee is a fact-intensive determination made on a case-by-case basis. *See In re Climate Control Mech. Servs., Inc.,* 585 B.R. 192, 200 (Bankr. M.D. Fla. 2018); *In re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3d Cir. 1989). Courts have recognized that "the concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide range of conduct." *In re Marvel Entm't Grp., Inc.,* 140 F.3d 463, 472 (3d Cir. 1998). Moreover, the list of causes set forth in § 1104(a)(1) is not exhaustive. *Id.; In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir. 1988).

### B.    Cause Exists to Appoint a Trustee Immediately Based on Prepetition Conduct.

Prepetition conduct may be sufficient on its own to support the appointment of a trustee. *See In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir. 1988); *In re Sanders,* No. 96-989876, 200 Bankr. LEXIS 263, at *9 (Bankr. N.D. Ill. Mar. 2, 2000); *In re Rivermeadow Assocs., Ltd.,* 185 B.R. 615, 619 (Bankr. D. Wyo. 1995). Allegations that the Debtor's CEO grossly mismanaged Company funds, engaged in incompetence, orchestrated "robbing Peter to pay Paul" schemes based on false statements to customers and suppliers would qualify under the "fraud, dishonesty, incompetence, or gross mismanagement" prong of § 1104(a)(1).

In addition, the Bankruptcy Court in *In re Intercat, Inc.,* 247 B.R. 911, 920–21 (Bankr. S.D. Ga. 2000), provided a list of factors courts consider in determining whether "cause" exists under § 1104(a)(1), including:

   a.  The materiality of the misconduct;

   b.  The evenhandedness (or lack thereof) in dealing with insiders or affiliates vis-à-vis
       other creditors or customers;

   c.  The existence of prepetition voidable preferences or fraudulent transfers;

   d.  The unwillingness or inability of management to pursue estate causes of action;

   e.  Conflicts of interest interfering with management's ability to fulfill fiduciary duties to
       the debtor; and

   f.  Self-dealing, or waste or squandering of corporate assets.

*Id.* In the Northern District, Judge Bihary applied the *Intercat* factors in *Crescive Landscape Mgmt.*

*v. PHDC, LLC (In re PHDC, LLC),* No. 03-93397, 2004 Bankr. LEXIS 1113, at *8 (Bankr. N.D.

Ga. Apr. 28, 2004).

   Initially, the first factor is particularly on point. The CEO's misconduct is material, as it

has destroyed $50 million of the Company's $75 million in annual revenue in just two years.

Likewise, the current CEO's failure to preserve assets and use of funds in a "Ponzi-like" manner

would qualify as highly material mismanagement.

   Additionally, the CEO meets the conflicts of interest factor head on. That is, the CEO has

"[c]onflicts of interest interfering with management's ability to fulfill fiduciary duties to the

debtor." *Id.* To be clear, the current CEO sees no upside to calling an end to his two year nosedive.

Even if he knew someone else could turn things around, it would not benefit him as an equity

holder. Apart from that, he continues to take a $340,000 salary while the Company operates in the

last throes of the negative spiral he caused. According to statements at the initial hearing on first

day motions, the CEO plans to continue his large salary even while, for example, not paying

overtime and commissions on employees' recent paychecks.

   In the end, the allegations stated above and supported by the Lennon Declaration attached

as Exhibit B, if proven, constitute clear and convincing evidence of all four factors: fraud,

dishonesty, incompetence, and gross mismanagement. *See Crescive Landscape Mgmt.,* No. 03-93397, 2004 Bankr. LEXIS 1113, at *6 (noting the reasons why the standard is now likely a preponderance of the evidence).

While that alone should end the matter, there is more. Based on the allegations above, and as would be demonstrated at an evidentiary hearing, the Debtor's continuation as debtor-in-possession is incompatible with the best interests of the Debtor and its creditors. This presents an additional and independent reason, which also mandates the appointment of a chapter 11 trustee:

## II.    The Appointment of a Chapter 11 Trustee Is Also Required Under § 1104(a)(2) Because It Is in the Best Interest of Creditors and the Estate.

Even if there were no cause under § 1104(a)(1), appointing a trustee is mandatory under § 1104(a)(2) if doing so "is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2). *See Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC),* No. 03-93397, 2004 Bankr. LEXIS 1113, at *8 (Bankr. N.D. Ga. Apr. 28, 2004) ("Courts may also appoint a trustee under § 1104(a)(2) when it is in the best interest of creditors.") (citing *In re SunCruz Casinos, LLC,* 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003); 7 COLLIER ON BANKRUPTCY P 1104.02[3][d][ii] (15th ed. 2003)).

Numerous courts have appointed Chapter 11 trustees under this standard. *See In re Microwave Prods. of Am., Inc.,* 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989); *In re L.S. Good & Co.,* 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980). Section 1104(a)(2) thus provides a "flexible standard" allowing for the appointment of a trustee whenever the "practical realities" indicate such an appointment is needed. *In re Sharon Steel Corp.,* 871 F.2d 1217, 1226 (3d Cir. 1989).

The *Crescive Landscape* court explained, "Under § 1104(a)(2), the Court tries to determine whether the benefits to the estate will outweigh the costs involved in appointing a trustee." *Crescive Landscape Mgmt.* at *8. "The Court may undertake a cost-benefit analysis in deciding

whether the interests of the estate would best be served by an independent trustee." *In re Cardinal Indus.,* 109 B.R. 755, 766 (Bankr. S.D. Ohio 1989); *L.S. Good & Co.,* 8 B.R. at 314.

First, the cost analysis is impacted by the fact that if a trustee were not appointed, then an examiner must be appointed under § 1104(c). More importantly, appointing a trustee is clearly in the best interest of the Debtor's estate and its creditors. As always, past performance does not guarantee future results, but the Company's undisputed reversal from significant positive growth each year—with no other changes except a new CEO—followed by a steep decline and the loss of $50 million in annual business in only two years, is a sufficient showing of incompetence, gross mismanagement, or both, almost as a matter of law. Moreover, the loss of $48 million in annual revenue is not even the worst of it, because the Company continues to decline.

Indeed, it is difficult to imagine any excuses or problems that competent management could not have addressed over two years. Nevertheless, the current CEO is entitled to his day in court to explain his side of the story. Movants simply request that the evidentiary hearing occur without delay before the issue becomes moot. The Company is still losing employees and customers, and it cannot find new suppliers fast enough to replace the ones that have been burned too many times. Yet, many of these same suppliers have indicated they would reopen supply lines if a management change and new funding were shown. *See, e.g.,* Dec. at ¶ 18.

To that extent, this case parallels *Microwave Products*, where the court found that even without conclusive evidence of prepetition cause, the best interests of creditors required the appointment of a trustee with operational expertise who could reorganize the debtor effectively. *See In re Microwave Prods. of Am., Inc.*, 102 B.R. at 675. In this case, the Movants proved they can manage the Company effectively for years, and for the last two, the current CEO has proven he cannot.

### III.   In the Alternative, an Examiner Must Be Appointed Under § 1104(c)(2) Because the Liquidated Unsecured Debts Exceed $5,000,000.

If the Court declines to order appointment of a Chapter 11 trustee, 11 U.S.C. § 1104(c) requires that an examiner be appointed if the Debtor's liquidated, unsecured debts exceed $5 million. *Walton v. Cornerstone Ministries Invs., Inc.,* 398 B.R. 77, 81 (N.D. Ga. 2008) ("The only appellate court to consider the question reached the same conclusion as this court, explaining that '[t]he provision plainly means that the bankruptcy court "shall" order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million, if the U.S. trustee requests one.'") (citing *Morgenstern v. Revco D.S., Inc. (In re Revco, D.S., Inc.),* 898 F.2d 498, 500-01 (6th Cir. 1990)). Specifically, 11 U.S.C. § 1104(c) provides, "If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request *of a party in interest <u>or</u>* the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner . . . ." (emphasis added).

Currently, Debtor's schedules reflect approximately $3.6 million of unsecured debt in its List of the 20 Largest Unsecured Claims (Doc. 1, at 5), which does not include Movants' substantial claims, the unsecured portion of First Horizon's Bank's claim, or other unsecured creditors. Movants believe the total unsecured claims that count under § 1104(c) far exceed $5 million, thus meeting the statutory threshold for an examiner's appointment. To the extent that an examiner would need to be appointed under § 1104(c), if a trustee were not appointed it would not eliminate such costs. More importantly, appointing a trustee rather than an examiner would drastically improve the Company's chances for a successful turnaround. An examiner can explain in more detail what went wrong but cannot put a stop to the Company's continuing decline. Only new money and new management can do that.

16

## CONCLUSION

Because the Movants bring new money and new but proven management, both of which are required for a successful turnaround of the Debtor, a chapter 11 trustee should be appointed under 11 U.S.C. § 1104(a)(2) because it is in the best interests of the Debtor's estate and its creditors. In addition, a trustee should be appointed for cause under § 1104(a)(1). Both sections constitute independent reasons requiring the appointment of a chapter trustee.

**WHEREFORE**, Movants respectfully request that this Court enter an order:

1. Granting this Motion;

2. Providing that a Chapter 11 Trustee be appointed expeditiously;

3. In the alternative, appointing an examiner if a trustee is not ordered; and

4. Granting such other and further relief as may be just and proper.

Respectfully submitted this 3rd day of February, 2025.

**FALLON LAW PC**

 /s/ Brad Fallon
Brad Fallon
Georgia Bar No. 226335
1201 W. Peachtree St. NW, Suite 2625
Atlanta, Georgia 30309
(404) 849-2199 | Fax (470) 994-0579
brad@fallonbusinesslaw.com

*Attorney for Movants*

17

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 25-50430-LRC |
| NUTRACAP HOLDINGS, LLC, | CHAPTER 11 |
| Debtor. | |
| NUTRACAP LABS, LLC, JOHN WESLEY HOUSER, DAVID BROMWICH, and THOMAS P. LENNON, | |
| Movants, | CONTESTED MATTER |
| v. | |
| NUTRACAP HOLDINGS, LLC, | |
| Respondent. | |

**ORDER DIRECTING THE APPOINTMENT OF A**
**CHAPTER 11 TRUSTEE AND GRANTING RELATED RELIEF**

THIS CASE came before the Court for hearing on [DATE], 2025 (the "Hearing") on the

*Expedited Motion for Appointment of Chapter 11 Trustee Under 11 U.S.C. § 1104(a)* (the

"**Motion**"), filed by Nutracap Labs, LLC, John Wesley Houser, David Bromwich, and Thomas P. Lennon (collectively, the "**Movants**"). In the Motion, Movants request the entry of an order appointing a Chapter 11 trustee for Nutracap Holdings, LLC (the "**Debtor**") pursuant to 11 U.S.C. § 1104(a), or, alternatively, appointing an examiner if a trustee is not appointed.

Having considered the Motion, all responses thereto, the evidence presented, and the arguments of counsel at the Hearing, and for good cause shown, the Court FINDS and CONCLUDES that:

(a)    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b);

(b)    Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409;

(c)    Notice of the Motion and the Hearing was sufficient and proper under the circumstances and no further or other notice is required;

(d)    The appointment of a trustee is warranted and in the best interests of the Debtor's estate and its creditors under 11 U.S.C. § 1104(a)(1) and/or § 1104(a)(2). In the alternative, if the Court were to deny appointment of a trustee, 11 U.S.C. § 1104(c) mandates the appointment of an examiner due to the Debtor's unsecured debts exceeding $5,000,000; and

(e)    After due deliberation, good cause exists to grant the relief requested in the Motion.

Accordingly, it is **ORDERED**:

1.    The Motion is **GRANTED** to the extent set forth herein.

2.      Pursuant to 11 U.S.C. § 1104(a), the United States Trustee shall, as soon as practicable, appoint a qualified Chapter 11 trustee in this case (the "Trustee"), and such Trustee shall have all the rights, powers, and duties authorized under the Bankruptcy Code, including the rights, powers, and duties of a trustee under Chapter 11.

3.      The Trustee shall act expeditiously to install a new CEO, giving due consideration to the person put forward by the Movants, Thomas P. Lennon, and due consideration to the ability of new management to obtain new operating capital for the company.

4.      Debtor's management shall cooperate fully with the Trustee and any new CEO appointed by the Trustee and shall immediately turn over or make available all documents, records, passwords, and other property of the Debtor's estate, including all financial accounts, software, and books and records, so that the Trustee (or examiner) may timely fulfill all fiduciary obligations.

5.      The Trustee appointed by the U.S. Trustee shall promptly file a notice of acceptance of appointment and otherwise comply with all applicable rules, including the duty to post a bond in accordance with 11 U.S.C. § 322 and Fed. R. Bankr. P. 2008.

6.      Within three (3) business days of the entry of this Order, Movants' counsel shall serve a copy of this Order on (a) the Debtor, (b) the Office of the U.S. Trustee, (c) all parties requesting notices, and (d) all known secured creditors, and shall file a certificate of service.

7.      The Court shall retain jurisdiction over all matters arising from or related to the interpretation, implementation, or enforcement of this Order.

**END OF DOCUMENT**

3

**Prepared and presented by:**

**FALLON LAW PC**

/s/ Brad Fallon
Brad Fallon
Georgia Bar No. 226335
1201 W. Peachtree St. NW, Suite 2625
Atlanta, Georgia 30309
(404) 849-2199
brad@fallonbusinesslaw.com
*Attorney for Movants*

**No opposition by (if applicable):**

**OFFICE OF THE UNITED STATES TRUSTEE**

*/s/ Jonathan Adams (signed with express permission)* (if applicable)
Jonathan S. Adams
Georgia Bar No. 979073
U.S. Department of Justice
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 331-4438 Telephone
Jonathan.s.adams@usdoj.gov

**ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Caitlyn Powers (signed with express permission)* (if applicable)
Will B. Geer, Ga. Bar No. 940493
Caitlyn Powers, Ga. Bar No. 856354
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
wgeer@rlkglaw.com
cpowers@rlkglaw.com
*Proposed Attorneys for the Debtor*

**Distribution List:**

Brad Fallon
FALLON LAW PC
1201 W. Peachtree St. NW, Suite 2625
Atlanta, Georgia 30309

Office of the United States Trustee
362 Richard B Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

Will B. Geer
ROUNTREE LEITMAN KLEIN & GEER, LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329

## **EXHIBIT B**

**Declaration of Thomas Lennon**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 25-50430-LRC |
| NUTRACAP HOLDINGS, LLC, | CHAPTER 11 |
| Debtor. | |
| NUTRACAP LABS, LLC, JOHN WESLEY HOUSER, DAVID BROMWICH, and THOMAS P. LENNON, | |
| Movants, | CONTESTED MATTER |
| v. | |
| NUTRACAP HOLDINGS, LLC, | |
| Respondent. | |

**DECLARATION OF THOMAS P. LENNON**

I, Thomas P. Lennon, declaring under penalty of perjury, hereby depose and say:

1.      I am over the age of eighteen (18) and competent to make this Declaration. Except as otherwise noted, I have personal knowledge of the matters set forth herein, and if called upon to testify, I could and would competently do so.

2.      I make this Declaration in support of the Expedited Motion for Appointment of Chapter 11 Trustee Under 11 U.S.C. § 1104(a) (the "Motion") filed by Movants Nutracap Labs,

LLC, John Wesley Houser, David Bromwich, and me, Thomas P. Lennon (collectively, the "Movants"), in the above-captioned bankruptcy case.

## My Prior Role with Nutracap

3.       I was formerly involved with Nutracap Labs, LLC ("Nutracap" or the "Company") in a capacity that included corporate finance and board involvement. From 2019 to 2022, I actively participated in the Company's growth strategies, supplier and customer relationship expansions, and related corporate development. Through my company Watermark Capital Partners ("Watermark"), I negotiated and facilitated the overall transaction between Nutracap Labs and Virtu Equity resulting in the sale of the Company to DBD DTA Corporation.

4.       During my tenure, annual revenues grew significantly. By 2022, Nutracap's annual sales exceeded $74 million, with net profits around $6.9 million. In 2022, Mr. Lima actually turned down a tender offer to acquire the Company for approximately $100 million in cash.

5.       Along with co-Movants, I facilitated or assisted in key operations, including financial planning, vendor negotiations, and relationships with major financial institutions, including the 2023 financing arrangement currently in place involving $17 million in credit facilities with First Horizon Bank. At the time, the relevant parties and I reasonably expected that Nutracap's annual sales would exceed $100 million in 2025.

6.       In June 2020, DBD DTA Corporation and Virtu Equity (collectively "Virtu") executed an LOU to purchase Nutracap from the Movants. At the time, the Company was growing more than 40% year over year.

7.       In November 2020, DBD DTA Corporation and Virtu Equity (collectively "Virtu") purchased a minority interest in Nutracap.

2

8.     In or around November 2021, the Debtor's current CEO, Mr. Marcos Fabio Lopes e Lima and his partners exercised their option to purchase the remaining shares of Nutracap from the Movants. As part of that transaction, the Movants took back unsecured promissory notes for more than more than $23 million with the Debtor's parent Company, DBD DTA Corporation. We have tried to be supportive as these loans have missed interest payments and have been in default since September of 2023. The remaining balance on these loans is over $12 million today.

9.     Over the subsequent two years, from 2023 through the end of 2024, Nutracap's revenues declined dramatically, from approximately $63 million in 2021 and $74 million in 2022 with Net Income of $7.0 million and $6.9 million, respectively, when the Movants were still involved in management of the company. After the Movants were gone and the new CEO, Mr. Lima, was managing the Company as CEO, revenue collapsed to approximately $48 million in 2023 and $26 million in 2024, with net losses of $4 million and $2.5 million, respectively.

10.     Sales are still declining, and for many reasons, they will continue to do so until Mr. Lima is replaced as CEO, or the Company goes out of business.

**Gross Mismanagement Under the Current CEO**

11.     Based on my knowledge and industry experience, the current CEO's decisions— such as hiring hundreds of additional employees without a corresponding increase in revenue, committing to a lease of 200,000 sq ft in additional space that was never utilized, running off the best sales people because he did not like that some earned more than him, and continually making false promises to customers and suppliers—led to a rapid decrease in annual sales and contributed to severe cash flow issues exacerbated by a toxic corporate culture.

12.     Nutracap is currently in default on its loan obligations to Movants and to First Horizon Bank (the "Bank"), which financed approximately $17 million in 2023. After Mr. Lima

3

began running the company without the Movants, the Bank transferred Nutracap to its special assets division within six months. According to the Bank, this set a record when the loan was closed and then sent to special assets within six months.

13.     By late 2024, numerous suppliers cut off the Debtor due to nonpayment and distrust of Mr. Lima's representations, and multiple key employees and customers departed and more continue to leave. Recently, the Company's remaining key marketing people quit.

14.     Mr. Lima continues to put certain employees in the position of assuring vendors and customers that the Company's promises will be kept—when they ship supplies or send large deposits for product orders—even when they know it is impossible.

**Misuse of Customer Deposits and Additional Operational Issues**

15.     Under Mr. Lima's management, the Debtor spent significant customer deposits on general operating costs rather than allocating such funds to purchase inventory or fulfill those customers' orders. The Company recently notified suppliers that it required more than a million dollars to purchase raw materials to complete orders that were already prepaid.

16.     In the last payroll, the Company failed to pay the salespeople's commissions and the overtime portions of employees' paychecks, blaming it on needing authorization from the bankruptcy court even though the non-overtime amounts were paid.

**Why Immediate Trustee Appointment is Critical**

17.     I believe that any chance at reorganization requires new management and an influx of capital. As it is, Movants believe that their notes for $12 million are likely to be worthless. To effect a successful turnaround of the Company, Movants are prepared to provide up to $7 million in new funding, including an immediate priming loan of $1.5 million, and manage the Company again.

4

18.    Based on my direct experience and discussions with several former personnel and vendors, the Movants have longstanding relationships with suppliers and former employees who would be willing to return if there is a credible change in management.

19.    The Bank is owed approximately $14 million, is significantly undersecured, and would probably only receive approximately $3 million in a liquidation at this point, and the unsecured creditors will receive nothing unless a trustee and a new CEO are appointed to preserve any remaining going-concern value. The current CEO's continuation severely jeopardizes the Debtor's ability to reorganize, time is running out, and an expedited decision on the matter is essential before issue is moot.

**Letter of Intent and Debtor's Bankruptcy Filing**

20.    On or about December 16, 2024, Watermark, on behalf of the Movants, negotiated a Letter of Intent (LOI) with Mr. Lima and the Debtor. This LOI contemplated an ownership repurchase and provided for a substantial new capital infusion and a potential buyout of the Bank's claims.

21.    Subsequently on December 17, 2024, Watermark made an offer to purchase the First Horizon debt. In early January, the Bank agreed in principle to the offer from Watermark, returning a redline version of the proposed debt purchase LOI.

22.    After securing the agreements with the Company and CEO Lima as well as an agreement in principle with First Horizon, additional time was needed to finalize terms and conditions with the Bank and complete the documents for the overall repurchase. I proposed an adjusted closing date of January 31, 2025.

23.    Shortly thereafter, the Debtor filed the instant bankruptcy petition on January 14, 2025, halting negotiations.

24.     Despite the filing, Movants are ready, willing, and able to close a transaction in line with the December 16, 2024, LOI previously agreed to by CEO Lima and the Bank. Movants stand ready to provide up to $1.5 million in DIP Financing via a short-term priming loan and up to an additional $5.5 million in new capital, which is required to stabilize the business and its supplier and customer relationships.

25.     In short, the Movants can provide the new management and new capital necessary to fund the Company's turnaround, conditioned on the installation of independent management via a Chapter 11 trustee.

### Conclusion

26.     My experience and familiarity with Nutracap's operations, combined with my observations of CEO Lima's actions, lead me to conclude that Mr. Lima's operation of the Company is incompetent by any measure and constitutes gross mismanagement under any reasonable definition.

27.     I hereby adopt and reaffirm each of the factual allegations in the Motion as though fully set forth herein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 2, 2025.

/s/ Thomas P. Lennon
Thomas P. Lennon

6

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 3, 2025, I electronically filed the foregoing *Expedited Motion for Appointment of Chapter 11 Trustee Under 11 U.S.C. § 1104(a),* using the Bankruptcy Court's Electronic Case Filing (ECF) program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

- Jonathan S. Adams    jonathan.s.adams@usdoj.gov
- Erich N. Durlacher    edurlach@burr.com, brobinson@burr.com
- Thomas T. McClendon    tmcclendon@joneswalden.com, jwdistribution@joneswalden.com;bdernus@joneswalden.com
- Caitlyn Powers    cpowers@rlkglaw.com, dsideris@rlkglaw.com;emiller@rlkglaw.com;wgeer@rlkglaw.com;6717577420@filings.docketbird.com;willgeer@ecf.courtdrive.com;2836@notices.nextchapterbk.com; rstuder@rlkglaw.com
- Kimberly B. Reeves    kimberly@caiolarose.com, tina@caiolarose.com,amber@caiolarose.com
- Elizabeth Barger Rose    Elizabeth@caiolarose.com, amber@caiolarose.com;tina@caiolarose.com
- William A. Rountree    wrountree@rlkglaw.com, 6717577420@filings.docketbird.com;wgeer@rlkglaw.com;2836@notices.nextchapterbk.com;willgeer@ecf.courtdrive.com;emiller@rlkglaw.com;emillerrlkg@ecf.courtdrive.com;rstuder@rlkglaw.com;dsideris@rlkglaw.com

I further certify that I caused a true and correct copy of the foregoing to be served by U.S. Mail, postage prepaid, on the Master Service List attached to the Interim Order Granting Emergency Motion to Limit Notice and Establish Notice Procedures (Doc. 25).

Dated: February 3, 2025                */s/ Brad Fallon*___
                                        Brad Fallon
                                        FALLON LAW PC